All right. Our next case is Bidi Vapor LLC v. U.S. Food and Drug Administration. And we'll take just a moment so that council have the opportunity to get themselves situated before we begin. Bidi Vapor LLC v. U.S. Food and Drug Administration All right. We'll hear first from Mr. Gotting. Good morning, Your Honors. Eric Gotting, Food Petitioner. I've been working with Bidi Vapor for a number of years, and I'm   So in March of 2023, Bidi responded to a letter that was issued by FDA alleging various deficiencies in Bidi's initial premarket tobacco application, which we call the PMTA. Bidi spent millions of dollars on that PMTA, including $1.6 million in conducting additional testing and responding to that product. The information submitted by Bidi, which we call the Cycle 2 toxicological data or TOCS data, provided multiple lines of evidence showing that the classic is far less risky, in fact, up to 99% less risky by some measures than traditional cigarettes and is comparable to other tobacco-flavored ends. Under the Tobacco Control Act, the PMTA rule, the PMTA guidance, the APA, and this court's own precedence, FDA was required to consider this clearly relevant information. In other words, FDA had to conduct a holistic, or all things considered, review in which this critical mass of data demonstrating extensive benefits to adult smokers is weighed and balanced in light of all other record evidence. Yet FDA never had its toxicologists conduct a Cycle 2 review of that information, and that was arbitrary and capricious and unlawful. Go ahead. I'm sorry. No, no, please go ahead. Just so I'm clear, does the error that you just alleged, the failure to use the specific test, does that run to all three of the deficiencies that the FDA pointed out or just one of them? Absolutely. Our position is that under the Tobacco Control Act and under the FONTM case out of the D.C. Circuit, they can't rely on each individual one. They have to take what they allege was missing in each individual deficiency and balance that against all of the evidence in the record, including that Cycle 2 tox data. And they didn't do that. They conceded that. They never did that. So you're saying that when the FDA says to us, there are three deficiencies, we conclude that any one of them would have been a sufficient basis to deny the application. We just can't take that at face value? Can't, because under the Tobacco Control Act, you have the APPH standard. That is a balancing standard. And under the Tobacco Control Act, they have to consider everything. Help me with this for just a moment. Let's talk, just to follow up on the question that was put to you by Judge Newsome, let's talk about one of the three. Let's talk about the high content of nicotine. As I understand the evidence in the case, the nicotine concentration of the Bitty Classic was 60 milligrams per milliliter, right? It's 6% concentration. Right, yes. And that, they said, was an extraordinarily high end. Indeed, the range was between three and 60. And here they were with a product that was at 60. How would conducting another cycle of tests have altered or affected that particular finding about concentration of nicotine? Would it have in any way altered that determination? Not how you balance, but simply the irreducible fact that the amount of nicotine was 60 milligrams per milliliter. It wouldn't change that fact. That's true. Okay, so let's assume it could not in any way affect that fact. Why couldn't they reasonably conclude when they were determining the public health that that concentration was so high when they weighed it against all of these considerations that the risk to public health was too great? The risk of increasing addiction to nicotine was too great. Why couldn't they use that figure and that figure alone, given the variance in the levels of nicotine in combustible cigarettes and in e-cigarettes, and say, it's just too high a risk. We don't think allowing this product out there maximizes the public health. There are two answers because you have to look at both the adult smoker side and the non-smoker use side. So it's actually a good thing. It is not a problem under the Tobacco Control Act that someone continues to be addicted. That is actually a good thing if it's a lower risk product. There's nothing in the Tobacco Control Act that requires us to show someone has to quit smoking. Indeed, FDA has conceded multiple times, not only in this case. Right, but the question, the essential question here is whether the conduct of the FDA was arbitrary and capricious. It was. Well, I understand, but I'm not reviewing this on a clean slate. So I have to ask, do I not? Whether the balancing they conducted based upon, I'm just talking about the content of nicotine, whether the was somehow unreasonable. Isn't that what I have to ask? Yes, I'll go to the youth. They said it's unlikely that youth and adult young smokers, or excuse me, non-smokers will use this product. The only thing they said that maybe someone will try this is they reflected on a theory they have regarding flavored products. Kids love flavored products. They switch, they chase the flavors. FDA has said for years, kids do not use, do not use tobacco flavored products. It is pure speculation for them to say that after they say it's unlikely that maybe some will use them later because the market forces are going to change. That was a theory.  Further though, to say maybe they will use them later. And if they do, they will become bad addicted. Yes, but our position is that was completely speculative. What do you have on the other side? You have data in the cycle two analysis. In the cycle two, we provided the behavioral study that showed 10% of our customers actually do use the tobacco product, the tobacco flavored product. They had hard data that adults are using this. They said the people who are going to be using those products are most likely going to be adult smokers. They admitted, they admitted that those smokers are going to switch to a lower, in this case, 99% safer product. That is a benefit. So now the scales are starting to go like this. If you put the cycle two lines of evidence on the scales, now you're like this. Let me ask you a question about a different aspect of this. One of the other things that is noted as a deficiency is, I guess Biddy used a three-second puff instead of a four-second puff. Is that right? Yes. And the idea was that, as I understood it, the FDA was concerned that that would mean because a four-second puff is 33% longer than a three-second puff, that you would draw in more deeply and heavily the chemicals that are within the product, the Biddy product. And it couldn't really evaluate or assess the effects of doing that because Biddy used a three-second puff instead of a four-second puff. And I just wanted to give you an opportunity to respond to that.  So we raised that in our deficiency. So we responded to the response. They did not respond to that. They did respond to it in their brief, and they made the point that it's 33%. Our position is it doesn't matter, and here's why. The L. Helani study, which you're referring to, looked at a bunch of products. They didn't consume the entire product. Right, and I saw that, and I was going to ask him about that. But even so, if you're – let's say that you're in an area and you're just sort of – I mean, not to go down the Clinton road, but you didn't inhale, you just – right? I mean, you know what I'm saying? There could be a significant and meaningful difference between a three-second inhalation and a four-second puff, right? I mean, there could very well be a difference in how much of the chemical you ingest and the concentration or whatever. Why doesn't that matter? Because we, Biddy, consume the entire product. We know what the maximum HPCs were. Right, but when you – again, let's just take it to an extreme. Let's say that it's a half-second versus a four-second puff. One would expect that even in consuming the whole product, that is, the whole product is gone at the end of it, that a four-second-long puff to consume the product might have a very different kind of total intake effect than a half-second puff or a fraction of a second puff to consume the whole product. Would you agree with that or not? No, we wouldn't. We would say – Why not? Because if you consume – we consume the entire product, so we know what's in there. So ultimately, if you're using the entire device, you're getting that much HPACs, and that line of evidence showed that the Biddy was less – Do you have anything that shows that it doesn't matter how long the puff is, that you will still consume the exact same amount of the chemicals? Because it seems like that's missing an important factor. Because without that, just sort of common sense seems to suggest, you know, if I just go like that, I'm not going to get as much in the way of chemicals as if I sit there and – four seconds is a long time. One, two, three, four. And that whole time, I'm dragging on the ENDS device, the Biddy stick. And, you know, you have to draw in much more deeply into your lungs to be able to do it for that long. It just – it seems – it just – it doesn't seem to make sense to me that it would be the same. Now, you might be totally right, but I wonder if you could direct me to someplace in the record that would show that. I don't know if we have anything in the record. Our position was because we consumed the entire product that the only thing that L-Huani could have done was underestimate the amount that people are actually consuming in total. So I would think to your – just to debate, the person who's doing four seconds, three seconds, is going to use up the product just faster. But you're still consuming the same thing. And that was – I think that was Biddy's point, and we do say that in the record. But I will note – well, it looks like my time is up. That's okay. I couldn't finish answering. I was going to say the L-Huani is just, excuse me, one of three different lines of comparables. And so FDA doesn't say how many comparables you need, and neither does the Backward Control Act. And so our position is that even if we lose on L-Huani, we – go back to Chen – we absolutely provided all the information they say is missing. And so that means we had two comparables, combustible cigarettes, which they don't contest, meaning the data, et cetera, and to the Juul. And those lines of evidence show that we are much less risky – or excuse me, comparable to those products. All right. Thank you very much. Before he sits down, I do have one other question for you so that it will allow your colleague to respond. We've talked about two of the alleged three deficiencies, but not the third. The third was in no particular order. They say that you did not conduct a complete leachable study in order to identify other possible leachables from the container closure of the new product. And then they lay out some of the things that you could have done but did not do. And they say that deficiency is of considerable moment to them in ultimately reaching the conclusion that the product was not a safe one or did not maximize public health. What's your answer to that one? Our response is that they didn't – A leachable study, the completeness of the study you offered. You offered a semi-quantitative, non-targeted gas chromatography mass spectrometry technique. They say, yeah, that tells you something but not everything, and you've got to tell us a whole bunch more. Yep. Under the cycle two tox data, which they didn't look at, we also did an extractable study. That extractable study was so aggressive, that's our position, was so aggressive, it would have found any leachable that would have ever come off that device. They never looked at it and told us, okay, yeah, that's good data, or it's not, and why. That is arbitrary and capricious. Thank you very much. All right. Thank you, Mr. Gotting. We'll hear next from Mr. Kennedy. Good morning. Scott Kennedy for the government and may it please the court. So I want to refocus the analysis on this case as follows. I think this case involves what I personally consider to be a very straightforward application of the Tobacco Control Act standard for adjudicating an application to the evidence, and in particular, I'm referring to the fact that the act requires FDA to consider, among other things, the risk that a product will help, or excuse me, the risk that a product will exacerbate or addict new users against the potential benefit of the product in helping smokers quit. That's exactly what FDA did here in what was termed deficiency three. Now, first on the risk side of the equation, and recall, the statute says FDA look at the risks and balance them against the benefits on the risk side of the equation, as your honors referred to earlier in the argument, FDA said, this is not just an addictive product with what we call abuse liability. That's shorthand for addictiveness. It's an exceptionally addictive product. In addition to the statistic that was mentioned earlier about the fact that this product is at the very, very highest end in terms of nicotine concentration. It also exposes users to 96% more nicotine than combustible cigarettes. Almost twice. I'll ask you a question about that though, because they also had comparisons to the enjoy and the jewel. And I think the enjoy may have had like, it looked like exactly the same amount. First of all, you can let me know if I have that wrong. Cause if I do, obviously that might affect the answer, but if I don't, then the enjoy received authorization, but the bitty stick did not. And I wonder if you could explain that. Yeah, there are several distinguishing characteristics between this and the S the enjoy product. One is we discussed in the briefing, the enjoy product FDA said was approaching or similar to the addictiveness overall of combustible cigarettes. Whereas this product was similar or greater than that's one difference. And that's despite the fact that there is, they don't both have 60, you know, 60 on the scale and 6% nicotine salts or whatever it is. I don't remember what the statistics are, but I thought that the numbers were the same, but I could be misremembering. Well, I think the important thing and your honor, candidly, I don't recall if the exact concentration was the same, but regardless of whether it was the same, that's not the only factor. The most important thing here that FDA looked at is in real world conditions and FDA called this ad libidum use. That just means the user in the test subject is free to use the product as they like to. It's not a laboratory type test where they say you got to puff 10 times or you got to use it for however many minutes in those conditions, the product delivers about 96% more nicotine to the user compared to combustible cigarettes. And there are a few reasons for that, that FDA gave one, it may trace to the very high nicotine concentration. There were a couple of others. FDA also mentioned the presence of nicotine salts in the product, which reduce its heart, reduce its harshness. But the bottom line is in real world ad libidum free use conditions, people get about twice as much nicotine from this product as they would from combustible. Let's make the comparison to the enjoy. I think it's the thrust of the question that judge Rosenbaum was asking. And I think those are several differences. So again, even if you didn't have anything remotely resembling 96% more nicotine to the user than a combustible cigarette in the enjoy product. Correct. That's my recollection. But beyond that, again, FDA said that the amount of abuse liability was approaching that of combustible cigarettes here. It was similar or greater than, but I want to add one more thing to that because we've only talked about the risks side of the equation. What is similar or greater than me? I mean, I know what greater than means, but what is similar mean the same or I mean, 96% could maybe be similar. Well, in this context, when you look at the rest of the findings by the FDA, when it was discussing abuse liability in what's called the TPL, that's really the decisional memorandum here. FDA teased it out a little bit more and they said, let's break it down by user. And this helps understand why they put it that way. For example, for existing users of e-cigarette products for that group, they said the nicotine exposure is just going to be straight up greater than combustible cigarettes. That's because those folks tend to take longer and bigger puffs for other groups, like folks that don't already use e-cigarettes. That's where they said similar to, or greater than. And I think the reason for that is when you tease out in the data, it looked like there were certain circumstances under which the use or the nicotine, the abuse liability would be similar. And there were others where it was clearly greater. So they were being scientists, they were being cautious and trying to account for the range of things that were shown in the data. That's why it was termed that way. So boiling it down to its essentials in so far as you're examining the risk side of the equation, you're saying it was the FDA's position that the risks were greater here than with the Enjoy product. That's the bottom line because the abuse liability was, you know, putting aside the nuances of how the terminology was used. It was greater with this product. And then I also want to turn again. And again, I just want to be sure that I understand why. Well, with respect to the Enjoy product, I don't have all the information in front of me. I don't recall if it's all on the record, but again, the exact words that FDA use. And I think this is the important part is with Enjoy, it was approaching that of combustible cigarettes in terms of abuse liability with this product. It was similar to or greater. So it was beyond approaching it at Adderley hit it or went greater. That's the distinction. That's the distinction. Yes. But beyond that, again, I think you really can't look at risks alone without talking about the benefits of the product. Now, FDA has approved multiple products as being appropriate for the protection of the public health on the ground, among other things that those applicants had shown with robust, reliable, scientifically valid data, that their product was actually going to help smokers quit in real world conditions. So Enjoy showed that other products have shown that where other applicants have succeeded, bitty failed. FDA was very clear about this. It's not only that this product exposes users to twice as much nicotine as cigarettes and has an exceptionally high abuse liability. It's also that on the other side of the equation, there was no showing in real world conditions that this was actually going to help smokers quit. Now, I think that's actually quite remarkable. If you consider the really high abuse liability as a lay person, I would expect it would have been very easy for Bitty to establish that this thing actually helps smokers quit. And yet they couldn't, which is quite remarkable. I think that makes this a very lopsided analysis. It wasn't a close call. In other words, from FDA's view, we have a substantially high risk on one side and no showing of a countervailing benefit on the other side. You apply the tobacco control act standard to that. It's hard to imagine a more clear cut example of an applicant that failed to establish their product was appropriate for the public health. Can I ask you a question related to the puff length? Why does it matter if they used three second puffs versus four second puffs? If they consumed the entire product, would it be, I mean, your friend on the other side of the aisle says it would be the exact same exposure because they consumed the entire product regardless. Is that correct? And if not, why not? I think it's important to look back again at the decisional memorandum. And I of course encourage the court to look here at a 808 to 809 of the record, but to paraphrase FDA, there was talking about several different issues with respect to the different comparator data sets we're talking about. And they overall went to a couple of key problems. The one that you just referred to your honor, which is the three versus four second puff that went to what FDA called, you know, puffing regimen, I believe was the terminology they use, but they listed a number of things that were problematic. It's puffing regimen. It's the puffing duration. It's the puffing machine use all of those inputs, all of those testing conditions between the comparator product and this and they need to line up so that you can have an apples to apples comparison because it's actually hard for the agency to know. So the difference just to boil it down again to its essentials is the puffing machine was different than the duration was different. That is three to four seconds. With respect to where I think if we're talking about the alcohol, just talk about that one deficiency that judge Rosenbaum is asking about. Yes. Speaking to the one deficiency, again, this is the, what's called the HPHC, the harmful aerosols. There were several problems categorically across that whole deficiency. There were multiple datasets encompassed within that deficiency. So talking to the deficiency as a whole, FDA cited a number of things. It wasn't even just the puffing machine. It was the puffing regimens, the puffing duration, the puffing machine used in some cases, the lack of adequate validation data. What they're saying is if I'm understanding them correctly, they're saying, look, we have a cartridge. We consumed a hundred percent of the cartridge. So it doesn't really matter anything else, the circumstances under which we consumed it, because we're comparing it to people who only consumed half of a cartridge. And when they consumed half of the cartridge, there were as many aerosols in what, you know, when we consumed the entire cartridge. So it could only ignore to our benefit. It can't possibly be that ours is more harmful. And they're saying that's all we need to look at, at least as far as I'm understanding their argument, maybe I misunderstood. They'll let me know if I did. But assuming that that is their argument, all we need to look at is, you know, we consumed the whole cartridge. So it doesn't matter how we did it. Do you want to address that?  I think there's one thing important to note that can get lost in all the detail. Again, we have, I know, a 70 page or so decisional memorandum here. It's very thorough, but there's one issue, and this is discussed at 803 in the record versus page 808. There are two facts I want to draw out here. As I think your honor mentioned earlier, with respect to the comparison data we're talking about, I think this is the Al-Halani data set and some from the Chen data set. There were 50 puffs used of the product. The lifespan of Bitty's product is 500 puffs. And that's again at 803 in the record. I believe they use 90% of the lifespan. It was several hundred puffs is what it boils down to. It may have been 250. I'm forgetting the precise number, but there were several hundred puffs that were used from Bitty's product to get the numbers that they got. Now, the problem FDA said is, look, when you look at this other data set where you only took 50 puffs, there are a whole bunch of compounds of these dangerous metals and other things that were BLOD. That means below the level of detection. So as far as the test was concerned, they weren't even there. That's a problem in part because as FDA said, look, we don't know if it's BLOD. We don't know if that means that users really don't get that stuff from the comparison data set, or if it's actually there. And we only would have known it if you had gone past 50 puffs. FDA wanted to know that so it could do the holistic comparison that Bitty, I think ironically is demanding. They wanted to be able to see how this product holds up relative to others. And if you puffed 100, 150, 200 puffs out of those comparison products, maybe one of those other things like cadmium or the other metals they listed, the other compounds would have shown up and then we can compare. And maybe even in that case, we can't rule out the possibility that it would have been a greater amount than what was shown in the testing of Bitty's product. I'm still not understanding because if they did 500 puffs and the comparison did 50 puffs and the level of, of harmful aerosols in Bitty's was either the same as, or lower than what was in the 50 puffs. How could it, I mean, how could it possibly be worse for Bitty if they did 500 puffs of the comparison as well? As I understand it, Your Honor, one of the issues is you don't necessarily know which 50 puffs you have to look at in a lifespan of the unit to get certain compounds. We just don't know.  But the point is if there are, if there are harmful chemicals in 500 puffs, right. I mean, you're not suggesting that if it's, if 500 puffs is 90% or maybe it's 450 puffs is the 90%. I don't know, whatever you're going to get. I mean, presumably you're going to get most of the harmful chemicals that you could get out of the, out of the whole cartridge versus 50 puffs. I mean, you're probably going to get less of the aerosol, you know, concentration of the harmful chemicals. And so if the, if the comparison product is showing the same number, even with one 10th of the number of puffs of harmful chemicals as Bitty is, why doesn't that ignore to Bitty's benefit instead of going against them? Again, I think it has to do with this below the level of detection, among other concerns. The fact that you have some compounds that might not be showing up at all in either test, or some of them may have shown up in Bitty's test and not this one. It's important to be able to see how much of those different products are in both as a complete percentage. So again, if there are things that are below the level of why, but why, I mean, if it's harmful and it's in it and it's in both Bitty and the comparison in the same amount in 500 versus 50 puffs, we wouldn't expect to see that it would be in a lower concentration after 500 puffs on the, on the comparison, would we? Well, I'll put it a different way. If, if the compound was say, below the level of detection on Bitty's product or say that it was, you know, at five, I'll just pick an arbitrary number. And then on the other side of the equation, we're looking at the comparator data sets. And it says that it's below the level of detection. We don't know whether it's there. We don't know how much now, if they had tested the thing all the way to the end or 90% of the life cycle of the product, we actually don't know what would have been revealed. If it had been revealed that that product, then it was still below the level of detection versus the unit was actually 10. It could have actually over or underestimated is what I'm trying to say. Because sometimes as I understand it, if you look at the middle 50 puffs or the end 50 puffs, you're going to get more or you're not going to get more. So it may still be below the level of detection at the end of the life cycle, or maybe you end up with 10. And I think that's relevant to the analysis overall, because on the Bitty side of the equation, maybe it showed below the level of detection and maybe it didn't, but I want to also back up and emphasize there were other problems. We're just talking about one data set within one deficiency of three backing up, even to the rest of this data set. FDA also said that there was insufficient validation data, which is what they would need to make sure. For example, that the testing methodology was actually sensitive enough to make sure that it was actually underestimating as opposed to overestimating. So that goes to the very core of what your honor is asking about. FDA also said that testing data lacks sufficient validation data now opposing counsel. But if I understood Bitty correctly, I thought that it was saying that at least some of the, some of the comparative evidence for some of the studies came from government studies. That, you know, The government would either have the information on, or that wasn't available to the public in more than. You know, they provided. So, first of all, I guess my first question is, am I remembering that correctly? And second, if I am, what is, what is, What am I supposed to do about that? Well, taking the second question first, I think your honor is referring to the SREC data set that they provided with respect to that data set. What they're supposed to do is, I mean, one option is to do what other applicants who have succeeded where Bitty failed is, and that's just choose other data. It's up to the applicant to choose their data source, to choose their comparisons. In this case, Bitty tested its product. And I think where they may have went wrong is they tested their product a particular way. And then they went and searched for data sets to compare. And those data sets didn't necessarily line up or didn't have enough information. They could have gone the opposite direction and pick data sets that had adequate information and then made sure their testing lined up. They didn't do that. So they could have again, done what other users did or other applicants did and pick different data that have the necessary information, or they could have conducted their own testing with respect to the first question about the SREC data more generally. You know, look, that data is publicly available, but FDA never said that an applicant will necessarily always be able to rely on all publicly available data for every part of its application. Of course it wouldn't be able to do that. You still have to have scientifically valid, robust, reliable data. And if you can't show that the data is scientifically valid, then you can't use it. Now, FDA is not in this case, obliged to go and search another agency's records for that validation data to see if it's there. It was Bitty's obligation to provide it. And they didn't. And again, it's not like FDA is asking the impossible because multiple other products have now been approved as being appropriate for the protection of the public health. So I see my time is over unless. I do have two questions, if I may. I'd like you to address the failure to conduct the cycle two toxicological review and tell me why that was not arbitrary and capricious under the circumstances of the case. As I understand it, you may decline to proceed with an additional cycle of review. If the review cannot cure the shortcoming already identified, they say, if I hear them accurately, that this cycle two toxicological review would indeed have cured some of the shortcomings that the FDA cited. I think your honor asked exactly the right questions on this subject earlier in getting down to the specific facts. So we don't miss the forest for the trees. Now with respect to the individual facts that are relevant here, you look at abuse liability as a whole and FDA's assessment of that. And you look at the facts underlying the conclusions about abuse liability, which included multiple things, the nicotine salts that reduce the harshness of the product, the very high nicotine concentration. Those two critical empirical facts would not be altered in any way by an additional cycle to review. Is that your point? That is part of my point. And in addition to that, I could keep going of course, but the actual amount of nicotine that's delivered to users, 96% more than cigarettes, none of those things would have been changed. The things underlying the abuse liability finding, for example, by a further toxicological review and on the benefits side of the equation, the failure to show a real world benefit of this product would not, and could not have been changed by a toxicology review, but one other, a further toxicology review. But one other point I'd like to make about that, because I think it's very important. There are multiple scientific reviews that are going on in this application, as your honors can see from the record. And one of the reviews was the chemistry review and the chemistry review looked at all of the evidence. There was no evidence that went unreviewed unlike in Biddy one, which is the case involving Biddy's flavored e-cigarette products. There was no evidence that went unreviewed. The chemistry review looked at the evidence and in what we've been discussing as deficiencies one and two said, wait a minute, we don't have enough information about the potentially harmful things that are included in your product. So that means the toxicology review, which is supposed to look at not what's in the product, but why it matters. They can't do their work because they're looking at a black box with respect to certain aspects of the product. So I think there's irony here in that not only was there no need to conduct a second round toxicology review, I think Biddy's omissions actually thwarted that review. Let me ask you my final question. With regard to one of the other deficiencies we've talked a little bit about with your colleague, the failure to conduct a complete leachable study. Would the study, the conduct of a cycle to a second toxicological review has borne on that in any way? No, Your Honor. Would it have remedied the problem of not having conducted a complete leachable study to identify other leachable products from the container closure system? No, Your Honor. And FDA said explicitly that it wouldn't have. That was at page a seven 93 in the record, but I can explain briefly why as a moment ago, the chemistry review is looking at things like what's in the product. You know, what are the chemical compounds that are in there? So it was the chemistry review that said, Hey, wait a minute. Your leachable studies didn't give us enough information because they didn't catch everything that might be lurking in there. You did gas chromatography, but you didn't do, for example, liquid chromatography, which Biddy should have known in FDA's view would have been important to catch everything that might be lurking in the e-liquids. Now that's a chemistry question that FDA answered said you didn't do enough. The toxicology review wouldn't look at that issue. They would be looking at, all right, now that the chemists have told us what's in this product, we're going to do an analysis of what implications that might have for users health. They can't do that work if there's questions that are left unanswered by the chemistry review. And one last thing I'll note is with regard to the extractable study, which opposing counsel referred to earlier, that's a separate study and it's very clear in the record, FDA right after in the chemistry review saying that the leachable study was insufficient. They went on to analyze the extractable study and they said that is a sufficient study for what it's designed to show, but it explained elsewhere in the decisional memorandum that it's not sufficient for everything because you can have leachables that don't, for example, come from the device parts. They can come from the manufacturing process. And I mean, I don't want to take you too far over too much further over, but you know, if you look back at the deficiency notice, it talks about the component parts. It doesn't talk about the packaging and other things. So that doesn't seem like it's exactly on point. I do think in the decisional memorandum that was discussed and I would direct the court to page eight Oh four and eight 11 for discussion of these issues, because FDA did specifically talk about how you need to look for not only leachables from the device parts, but the manufacturing process. And most importantly, in the deficiency letter, it told Biddy, you need to show us all of the leachables that might be in your e-liquid regardless of their source. That's the problem. All right. Thank you. Thank you. All right, Mr. Gotting. We're going to give you some extra time. You don't feel like you need to use all of it, but if you want it, we'll give you up. We'll give you seven more minutes since we took him over by seven. Mr. Gotting at the outset helped me with one thing. Your colleague said, yes. He in examining the weighing process looked on the one hand at the risk side of the equation. And on the other hand, the benefits of the product and with regard to the benefits of the product, he said that you didn't make any showing that the product you were offering really helped smokers quit. What evidence, if any, did you present to the FDA that said that? FDA concedes it. They say if you try this product and you're an adult smoker, you will switch. And that's based on the evidence that we showed based on all the studies, including cycle two studies that we showed, you know, whether it's perception, whatever they concluded, not they concluded that you will. Other than what they said, did you put anything on, on that point? Yes. We, we. Just tell me what it is you presented to establish that the product actually helps smokers quit. Yes. Which is the benefit side of this weighing equation. Yeah. Among others, we submitted the perceptions and behavioral intention study, which I believe was, no, that was before the cycle two, which showed that 20% of adult smokers not only intended to try the pity stick, but intended to use it to switch. And, you know, based on that evidence and others, that is. But that's different, right? I mean, intending to use it to switch is different than actually switching. You might intend to do a lot of things, might intend to quit completely, but you know, addiction causes other problems that make it more difficult to quit than just deciding you want to. I'll say to another study, it wasn't specific to classic. It used all of the bitty products, but it included the classic. This is a survey on bitty stick usage and potential impact. So this is actual use. This isn't just perceptions. 53% said they quit smoking. 54% said unlikely to resume smoking. Let me ask you a second question. That was the subject of a good deal of discussion with your colleague, Mr. Kennedy. I asked this question earlier about the nicotine concentration in bitty classic, and it was established that the concentration was 60 milligrams per milliliter. And then we were looking at the comparison with the enjoy product. And I asked him what the concentration was of that product. And he said he wasn't sure, but he used some language that the FDA used to suggest that there was a difference. What was the concentration of the enjoy product? It was 60%, 60 milligrams per milliliter. Probably so. And we pointed that out. Additionally, he said there was 96% more nicotine to the user than in combustible cigarettes in your product. That is incorrect. Tell me why that's incorrect. Three times in their brief, they equated a single bitty stick to a single cigarette. That is incorrect. In the PMTA we noted that a single bitty stick has 84 milligrams of, of, of, of nicotine. That is equal to two packs of cigarettes. Our label says you should be using one bitty stick a week. If you look at the page number, I think it's five, five, nine. Doesn't that assume that that's in fact how users will use it. I mean, is that based on some real world comparison that that's what, what actual users do? Yeah. I don't know if I can cite anything in the, in the record, but there's, is there anything in the record on that? No, but I think it, I mean, that seems problematic. Yeah, but, but, but I mean, so let me go back to their page. Their page doesn't equate a single bitty stick to a single cigarette. It's to what they do in a day. And they didn't, they didn't include that page is I think it's five, five, nine. They didn't include that page in the, in the record. But it's to the, what they do in a day and we all know it's just common sense that smokers smoke a pack or two a day or can. That was misleading. That was a misstatement by FDA in their brief. At 96% is, is, is, is, and when we know it's, it's, and I think you guys, several of you made this point. We submitted evidence that in under controlled use, the amount of nicotine someone's getting from a bitty stick and a cigarette is the same. That couldn't be true. And they didn't doubt that. They said, okay, that's good data, but we were going to do the ad lib, a little bit or whatever, but that couldn't be true. If it's 96% more. Let me ask the final question. With regard to doing the cycle to review, which they refused to do and which you said amounted to arbitrary and pretty capricious conduct on their behalf with the cycle to study have helped you establish liquid chromatography with regard to, we're talking about the leachables now. Yes. Our position, and this goes back to just standard APA law. Our position is that we were so aggressive in that, that it would have not only pulled off everything that would ever, ever leached, it would have pulled off more. And so they need to look at that because that's relevant and tell us their health folks need to tell us. Would the cycle to study have addressed the failure to do liquid chromatography? If the answer is yes. And I hear you to say, yes. Tell me why in simple layman terms. So we did not, we don't need a degree in organic, inorganic chemistry to answer the question. Tell me why. If I understand your question, the extractable study did all of the tests, the four tests that they asked for. Okay. It would have captured all of the different compounds that they were looking for. Yes. I was going to see if I had any other I think we've addressed all the questions. All right. Thank you. Thank you.